UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL PUBLIC RADIO, INC. and
TIM MAK,

                Plaintiffs,

    v.                                                                  No. 19-cv-17 (JDB)

UNITED STATES DEPARTMENT OF
THE TREASURY,

                Defendant.

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
DEFENDANT TO PROMPTLY PRODUCE "REFERRED" DOCUMENTS**

Defendant the United States Department of the Treasury respectfully submits this opposition to Plaintiffs' Motion to Compel Defendant to Promptly Produce "Referred" Documents, ECF No. 20 ("Plaintiffs' Motion"). Defendant has devoted extraordinary resources to responding to Plaintiffs' Freedom of Information Act requests. To date, Defendant has reviewed over 60,000 pages of records for responsiveness, and processed over 11,000 pages of responsive records. In the course of that review—consistent with applicable regulations—Defendant has consulted and coordinated with other agencies to ensure that important equities such as law enforcement and national security interests are appropriately protected. Defendant likewise has followed applicable regulations in providing notice to outside parties that have submitted information to Defendant, if such information has been identified in records responsive to Plaintiffs' requests, to ensure that confidential commercial information also is protected from disclosure. These processes—consultation/coordination and the "submitter notice" process—are necessary to safeguard the information that Congress intended to shield

from disclosure in the Freedom of Information Act ("FOIA"). As detailed herein, Defendant has made significant progress as to these processes with respect to documents responsive to Plaintiffs' FOIA requests; Defendant has received responses to twenty-six of thirty-seven consultation requests, and now awaits the response in only one submitter notice process out of thirteen.

Plaintiffs' request that the Court nonetheless order production in thirty days of every document subject to those processes without regard for whether they have been completed almost certainly would result in the disclosure of sensitive law enforcement, national security, and confidential commercial information. Moreover, Plaintiffs fail to acknowledge the extraordinary resources Defendant has devoted to responding to Plaintiffs' FOIA requests, and the unprecedented obstacles faced by Defendant and other agencies doing their best to continue their work during a pandemic. The cases upon which Plaintiffs rely—where little or no progress at all had been made in responding to the FOIA requests at issue—bear no resemblance to the situation presented here, where Defendant has followed reasonable processes and demonstrated consistent diligence in responding to Plaintiffs' requests.

For all these reasons, the Court should permit Defendant to continue its consultation/coordination and submitter notice processes, and deny Plaintiffs' Motion.

## BACKGROUND

**A. Procedural Background and Processing Status**

In letters dated May 14, 2018 and August 14, 2018, Plaintiffs submitted three FOIA requests to Treasury, seeking documents from the Office of Foreign Asset Control ("OFAC"). Decl. of Marshall H. Fields, Jr. (Aug. 20, 2019), ECF No. 15-1, Ex. A–C; *see also* Decl. of Marshall H. Fields, Jr. (Mar. 12, 2021) ("Fields Decl."), Ex. 1 hereto, ¶ 9. Broadly, those

requests sought records concerning Alexander Torshin and Oleg Deripaka; Maria Butina; and Kalashnikov Concern, the National Rifle Association, and Mark Barnes.  Compl. ¶¶ 13, 20, 23. Defendant corresponded with Plaintiffs regarding these requests via letters dated July 6, 2018; July 16, 2018; August 21, 2018; and August 23, 2018.  *See* Answer, ECF No. 7, ¶¶ 14, 15, 21, 24.  Also in 2018, OFAC undertook tasking searches for responsive records.  Fields Decl. 6 n.6. On January 3, 2019, Plaintiffs filed their Complaint.  *See* ECF. No. 1.[1]

After conducting searches and conferring with Plaintiffs regarding the scope of their requests, OFAC estimated that approximately 52,000 pages of records remained to be processed in this case as of August 2019.  Fields Decl. ¶ 10.  The parties were unable to reach agreement regarding the processing schedule for those records, *see* ECF Nos. 9–11, and submitted their respective proposals to the Court.  *See* ECF Nos. 14, 15.  Plaintiffs asked the Court to order review of 5,000 pages per month, while Defendant proposed a maximum requirement of 2,000 pages per month.  *See* ECF No. 14 at 1; ECF No. 15 at 3; *see also* Fields Decl. ¶ 11.  Plaintiffs' proposal also asked the Court to order that, *inter alia*, "[t]o the extent that OFAC finds documents that require consultation with other agencies or other components of Treasury, it must complete such consultation within one month, and then either produce the document or state what exemptions it claims apply."  ECF No. 14 at 3.  In an order dated August 23, 2019, and clarified on September 24, 2019, the Court required Defendant to review 3,000 pages per month, *see* ECF No. 16 at 4; Minute Order (Sept. 24, 2019), estimating that "[a]t this rate, the agency will process the remaining documents within the next 17 months or so."  ECF No. 16 at 4.  The

---

[1] The Complaint includes a fourth FOIA request seeking documents from the Office of International Affairs ("OIA").  *See* Compl., ECF No. 1, ¶¶ 26–28.  However, OIA has completed its production of responsive documents, and that fourth request is not at issue in Plaintiffs' Motion.  *See* Pls.' Proposal Regarding Production of Documents, ECF No. 14, at 1 n.1 (acknowledging that OIA had completed its document production).

Court declined to order Plaintiffs' proposed provision limiting to thirty days the time available to consult with other agencies or components regarding their equities in responsive documents. *See* ECF No. 16, *generally*.

Since the entry of the Court's order, Defendant has expended extraordinary resources to comply with the review schedule therein required. Although the OFAC FOIA Office has had over 200 other FOIA requests and between four and eleven litigation matters pending at the same time, the Office dedicated fourteen to twenty percent of its total analyst resources to the instant case.[2] *See* Fields Decl. ¶¶ 13, 15–16. One analyst works on this case full time, and has devoted numerous nights and weekends to the instant matter both to keep up with the monthly review requirement and to make progress on consultations/coordinations and submitter notices. *See id.* ¶ 14. For example, in 2020, that analyst logged over ninety overtime hours on this case. *Id.* Additionally, Mr. Fields, OFAC's Assistant Director, Information Disclosure and Records Management Division, has devoted approximately twenty percent of his own time to this case; and the FOIA Chief and FOIA Administrator also dedicate time to this case. *See id.* ¶ 13.[3]

This commitment of significant resources to this matter has allowed OFAC to meet the Court's monthly review requirements, with only three exceptions when it sought extensions for good cause, and with Plaintiffs' consent. Fields Decl. ¶ 17. This outlay of resources has kept

---

[2] The range of percentages reflects that the total number of analysts in the office has fluctuated between five and seven during the course of this litigation. Fields Decl. at 5 n.3.

[3] The OFAC FOIA Office has devoted such a large proportion of its resources to the instant case that there have been negative repercussions for OFAC's ability to handle other FOIA requests and litigation. Fields Decl. ¶ 15. The number of pending FOIA requests has risen from 224, as of the date of the Court's production order, to 306 pending requests as of the date of this filing. *Id.* During the same timeframe, the number of litigation matters has nearly tripled, rising from four to eleven cases. *Id.* ¶ 16. This is the highest number of litigation cases the FOIA office has ever been involved in, and most of the cases relate to an alleged failure to respond to FOIA requests. *Id.*

OFAC on schedule notwithstanding that the COVID-19 pandemic has negatively affected the review capabilities of the office, including with respect to the processing of records in this case. *See id.* ¶ 18.  In particular, the unprecedented number of Treasury employees teleworking has led to IT challenges to completing FOIA functions and accessing certain records and information, including documents pertaining to this litigation. *Id.*

To date, OFAC has reviewed more than 60,000 pages of records for responsiveness and processed over 11,000 pages of records responsive to Plaintiffs' FOIA requests.  Fields Decl. ¶ 17.  Among those documents, OFAC has identified equities necessitating use of the consultation/coordination or submitter notice processes.  Those processes are discussed below, along with OFAC's progress in completing those processes as to records responsive to Plaintiffs' FOIA requests.

OFAC expects, in the next two months, to complete the production of records not subject to the consultation/coordination or submitter notice processes.  Fields Decl. ¶ 38.  However, OFAC also anticipates that the remaining review and processing will identify additional records that will require those processes. *Id.* ¶ 37.

**B. Consultation/Coordination**

Among certain of the records that OFAC has processed, OFAC identified equities of other agencies or components of Treasury. *See* Fields Decl. ¶ 19.  With respect to such records—where another agency or component may be better positioned to determine whether the record contains exempt information—31 C.F.R. § 1.3(d) provides that OFAC must use the consultation, referral, or coordination process. *See id.*  With respect to the consultation process, the regulation provides: "When records originated with the component processing the request, but contain within them information of interest to another agency or other Federal Government

5

office, the agency processing the request should typically consult with that other entity prior to making a release determination." 31 C.F.R. § 1.3(d)(1). The coordination process, on the other hand, must be used when the component processing the record "believes that a different agency is best able to determine whether to disclose the record," *Id.* § 1.3(d)(2)(i) such that the record might be otherwise subject to referral—*i.e.* having that other agency respond to the request— but referral is not appropriate because disclosure of the identity of that other agency "could harm an interest protected by an applicable exemption." *Id.* § 1.3(d)(3).[4] In such situations, the component processing the record should "coordinate with the originating agency to seek its views on the disclosability of the record." *Id.*

When the analyst reviewing records in this case identifies the equities of other agencies or components of Treasury in a document, she removes the entire record from the production and seeks the input of that equity holder. *See* Fields Decl., ¶ 22. For efficiency, the analyst may gather documents from multiple productions before submitting a record set to another agency or component for consultation. *Id.* ¶ 23. Often, one record may contain equities of multiple agencies or components, requiring consultation with multiple equity holders. *Id.* Additionally, an agency with which OFAC consults may notify OFAC that the document contains equities of another agency that should not be identified due to concerns about revealing exempt information, requiring that OFAC undertake coordination with that other agency. *Id.* ¶ 27. In sending records for consultation/coordination, the analyst asks the receiving agency to expedite the response, and informs the agency that the consultation/coordination is related to litigation. *Id.* ¶ 34. The analyst also follows up on outstanding consultation/coordination requests via email. *Id.*

After the analyst receives the input of all of the relevant equity holders, she reviews the

---

[4] No referrals were used in this case. Fields Decl. at 7 n.11.

responses. *Id.* ¶ 24. At times, the responses require clarification, and the analyst must again contact equity holders to clarify redactions and potentially await a revised response. *Id.* After all equity holders have responded and any inconsistencies are corrected, the analyst applies the equity holders' redactions as well as any OFAC redactions to the records, and then sends the records through quality assurance, and subject matter expert and attorney review to ensure that all exempt material is appropriately protected. *Id.* ¶ 25. Only after these reviews are accomplished can the analyst release the redacted record set to the Plaintiffs. *Id.*

OFAC has made substantial progress with respect to consultations/coordinations in this case. Since July 2019, OFAC has sent out thirty-seven consultation/coordination requests; twenty-one formal requests to ten agencies and sixteen formal requests to other components of Treasury, involving a total of over 1900 pages of records. Fields Decl. ¶ 32. To date, OFAC has received responses to twenty-six of its requests, and is awaiting responses to eleven others. *Id.* ¶ 33.

Mr. Fields notes that other agencies with equities in records responsive to Plaintiffs' requests have reported that their ability to respond to a consultation or coordination has been negatively impacted by the COVID-19 pandemic, including due to significantly reduced staffing and competing priorities. Fields Decl. ¶ 39. Those agencies include, *inter alia*, the Department of State and the Federal Bureau of Investigation ("FBI"). The FOIA operations of both have been significantly affected by the ongoing pandemic. Indeed, in light of the unprecedented widespread and immediate risks to health and safety, the FBI temporarily halted its FOIA program at one point. *See* Decl. of Michael Seidel, Ex. 2 hereto, ¶¶ 9–11. As FBI primarily relies on a classified records system for its FOIA work, it cannot process FOIA requests remotely. *Id.* ¶ 17. Although the FBI resumed its FOIA program in June 2020, COVID

exposures and related absences nonetheless resulted in less than full staffing. *Id.* ¶ 16. By December 7, 2020, FBI's Information Management Division concluded that to ensure the health and safety of its personnel, its offices should be reduced to 50% staffing posture. *Id.* ¶ 17. It continues to operate at that level, and the diminution of its processing capabilities has impacted the speed with which it is able to respond to consultation requests, including the requests at issue here. *Id.* ¶¶ 17–18. The pandemic also has significantly reduced the State Department's FOIA processing capabilities. Currently, the State Department is requiring its FOIA staff to maximize telework. *See* Decl. of Eric F. Stein, Ex. 3 hereto ¶ 29. Although the State Department has gone to great lengths to adapt its operations using new technology and by acquiring additional human resources, its FOIA processing capabilities remain severely constrained due to ongoing precautions taken to reduce the likelihood of COVID-19 transmission in the workplace. *See id.* ¶¶ 26–32.

### C. The Submitter Notice Process

Separately, OFAC also has had to address confidential commercial information present in certain records responsive to Plaintiff's FOIA requests. 31 C.F.R. § 1.5 governs Treasury's handling of confidential commercial information, and sets forth procedures for when notice is required for a submitter of such information. Fields Decl. ¶ 28. Section 1.5(a)(1) defines confidential commercial information as "trade secrets and commercial or financial information obtained by the Department [of the Treasury] from a submitter that may be protected from disclosure under Exemption 4 of the FOIA." A submitter is defined as "any person or entity from whom the Department [of the Treasury] obtains confidential commercial information, directly or indirectly." 31 C.F.R. § 1.5(a)(2). This regulation requires that a Treasury component "promptly provide written notice to a submitter whenever: (i) the requested

confidential commercial information has been designated in good faith by the submitter as information considered protected from disclosure under Exemption 4; or (ii) the component has a reason to believe that the requested confidential commercial information may be protected from disclosure under Exemption 4 of the FOIA." 31 C.F.R. § 1.5(b)(1).

When OFAC determines that the submitter notice process applies to a record, the OFAC FOIA office drafts a letter to each submitter informing the submitter of the FOIA request seeking its information, describing the standard for withholding information under FOIA Exemption (b)(4), and notifying the submitter that it has ten business days to review the information and respond with any written objections. Fields Decl. ¶ 29. Attached to the submitter letter is a copy of the submitter records responsive to the FOIA request. *Id.*

If the submitter sends written objections, the analyst must review the objections to determine if the arguments for withholding information meet the standard for protection under FOIA Exemption (b)(4). *Id.* ¶ 30. Where there are questions regarding the applicability of the exemption, the analyst may discuss the objections with a supervisor, and may seek input from the Chief Counsel's Office, if needed. *Id.* Once a determination is made regarding the submitter's objections, the analyst must draft a letter, known as a determination notice, responding to the objections and informing the submitter whether the information will be withheld under Exemption (b)(4) or another FOIA exemption, or if the information or records will be released over the submitter's objections, and providing an explanation for the basis for the determination. *Id.* ¶ 31. After the letter is sent, OFAC allows the submitter at least ten business days before release of the records, to allow the submitter to seek an injunction to prevent release of the records if they wish to do so. *Id.*

OFAC has made significant progress with respect to the submitter notice process in this

case. Thus far, OFAC has sent out submitter notices to thirteen different parties, enclosing 221 pages of records. Field Decl. ¶ 35. OFAC has received responses to nine of those notices. *Id.* With respect to another three, the time for objecting to release passed without the submitter objecting. *Id.* OFAC is still awaiting responses to one submitter notice. *Id.*

## ARGUMENT

### A. The Consultation/Coordination and Submitter Notice Processes that OFAC Has Followed in this Case are Reasonable.

As the D.C. Circuit has recognized, the "FOIA explicitly permits 'consultation . . . with another agency having a substantial interest in the determination of the request." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1118 (D.C. Cir. 2007) (quoting 5 U.S.C. § 552(a)(6)(B)(iii)(III)). Moreover, the Department of the Treasury's regulations, which OFAC follows, require OFAC to determine for each record it reviews "whether another component or another agency of the Federal Government is better able to determine whether the record is exempt from disclosure under the FOIA." 31 C.F.R. § 1.3(d). For such records, OFAC is required under the applicable regulation to "consult with that other component or agency prior to making a release determination," or to use a referral procedure not applicable in the instant case. 31 C.F.R. § 1.3(d)(1). The regulation further permits OFAC to withhold the identity of the other agency "where disclosure of the identity of the component or agency to which the referral would be made could harm an interest protected by an applicable exemption, such as the exemptions that protect personal privacy or national security interests." 31 C.F.R. § 1.3(d)(3). The submitter notice process that OFAC has followed in this case likewise is mandated by regulations governing the Treasury Department, and, as discussed above, is targeted to ensure that confidential commercial information exempt from disclosure under Exemption 4 is appropriately protected. *See supra* 8–9 (discussing 31 C.F.R. § 1.5).

10

Plaintiffs request that the Court compel disclosure of records before the other governmental agencies finish their review, or the submitters of confidential commercial information have had an adequate opportunity to object to its disclosure.  However, the Court may "compel[] disclosure of the documents only if they were '(1) improperly'; (2) withheld 'by the [agency].'" *McGehee v. CIA*, 697 F.2d 1095, 1109 (D.C. Cir.), *on reh'g*, 711 F.2d 1076 (D.C. Cir. 1983) (quoting *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 150 (1980)).  The D.C. Circuit has found that an agency's system for sending documents to another agency for review "constitutes 'withholding' of those documents if its net effect is significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them." *Id.* at 1110.  And that "withholding" "will be deemed 'improper' unless the agency can offer a reasonable explanation for its procedure." *Id.*;[5] *see also Peralta v. U.S. Attorney's Office*, 136 F.3d 169, 175 (D.C. Cir. 1998) (noting that "there is no 'bright line' test for evaluating" the procedure used by the agency).

Here, OFAC has followed its standard consultation/coordination procedure, mandated by regulation, whereby a FOIA analyst identifies information in the records that concerns another agency's or component's equities; sends that record to the agency for a consultation/coordination; and informs Plaintiffs in the cover letters to the productions that documents have been sent to other agencies for consultation.  *See supra* 5–7; *see also* Pls.' Mot. at 2 n.2 (noting that, "every month, Treasury's cover letter to the document production indicates how many documents it has referred out").  Furthermore, in sending records for consultation/coordination, the analyst asks the receiving agency to expedite the response, and

---

[5] Plaintiffs quote *McGehee* regarding when referral can be "tantamount to withholding," Pls.' Mot. at 4, but omit the D.C. Circuit's guidance, discussed above, that withholding is not improper if the agency can offer a reasonable explanation for its procedure.

informs the agency that the consultation/coordination is related to litigation. Fields Decl. ¶ 34. The analyst also follows up on outstanding consultation/coordination requests via email. *Id.* As Mr. Fields explained, this consultation/coordination process mandated by Treasury's regulations is very important to ensure that all equities of other agencies are protected—including law enforcement and national security related equities—particularly since OFAC is not always aware of the extent of those equities. Fields Decl. ¶ 26. Mr. Fields notes that this is particularly true of the records involved in this case. *Id.*

The submitter notice process is likewise necessary to protect confidential commercial information properly exempt from disclosure, and the process that OFAC follows is reasonable because it closely tracks the requirements of the applicable regulation, 31 C.F.R. § 1.5. When OFAC determines that the submitter notice process applies, consistent with the regulation's requirements, OFAC provides written notice to the submitter and includes a copy of the requested records. *See* Fields Decl. ¶ 29; 31 C.F.R. § 1.5(b)(2). OFAC then provides a "reasonable time period," *i.e.* ten business days, for the submitter to provide written objections to disclosure of the information, *see* Fields Decl. ¶ 29; 31 C.F.R. § 1.5(d), and considers any objections received in deciding whether to disclose the requested confidential information. *See* Fields Decl. ¶ 30; 31 C.F.R. § 1.5(e). OFAC then provides a written determination notice to the submitter, explaining the basis for the determination. *See* Fields Decl. ¶ 31; 31 C.F.R. § 1.5(f).

Furthermore, these procedures—both for consultation/coordination and submitter notice—are standard across much of the Government. For example, the Department of Justice has regulations for consultation and coordination that mirror the regulations that OFAC followed in this case. *See* 28 C.F.R. § 16.4(d). And OFAC's submitter notice provisions track

the provisions of Executive Order 12600, which ordered that "the head of each Executive department and agency subject to the Freedom of Information Act shall, to the extent permitted by law, establish procedures to notify submitters of records containing confidential commercial information."  Exec. Order 12,600, 52 FR 23781, §1 (June 23, 1987).

Accordingly, because OFAC followed reasonable procedures, consistent with applicable regulations used throughout the Federal Government, to safeguard information properly exempt from disclosure under FOIA, the Court should find that OFAC is not "improperly withholding" records through its consultation/coordination and submitter notice processes. *McGehee*, 697 F.2d at 1110.

### B. The Case Law Offers No Support for the Relief that Plaintiffs Seek.

In support of their Motion, Plaintiffs rely on cases that bear no resemblance to the situation before the Court.  Plaintiffs look to cases in which little or no progress at all had been made in responding to the FOIA requests at issue.  The opposite is true here.  OFAC has gone to extraordinary lengths to respond to Plaintiffs' requests.

In arguing that the Court should disregard OFAC's process and order the disclosure of information that may otherwise be exempt under FOIA, Plaintiffs rely principally on *Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983).  *See* Pls.' Mot. at 4.  But that case is inapposite.  There, the Court of Appeals ordered the agency to provide an affidavit within 30 days setting forth the reasons for withholding "to foreclose the possibility of further unnecessary delay," *Paisley*, 712 F.2d at 691, because the plaintiff in that case had not received the requested records for *four years* and the agency did not inform the plaintiff for 18 months that her records had been referred to another agency for processing.  *Id.* at 691 n.22.  The other cases cited by Plaintiffs likewise offer little guidance here.  In *Keys v. Department of Homeland Security*, 570 F. Supp.

2d 59 (D.D.C. 2008), the court found that the Secret Service improperly withheld documents when it referred them to another agency; entirely failed to follow up with that agency; and the agency did not respond for nearly a year. *Keys*, 570 F. Supp. 2d at 70. And, in *Brennan Center for Justice v. Dep't of State*, 300 F. Supp. 3d 540 (S.D.N.Y. 2018), six months had passed since the plaintiff's FOIA request was submitted; nothing had been produced; and there was no schedule for production in place, although the plaintiff was seeking only six documents in that litigation. 300 F. Supp. 3d at 549.

This case is plainly distinguishable from *Paisley*, *Keys,* and *Brennan Center*. OFAC has devoted extraordinary resources to Plaintiffs' requests. Citing *McGehee*, Plaintiffs insist that Treasury "must take responsibility for processing the requests." Pls.' Mot. at 3 (quoting *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983)).[6] But, by any definition, Treasury has done so. Notwithstanding the pendency of hundreds of other FOIA requests and a number of litigation matters, the OFAC FOIA Office has assigned an analyst full time to this matter, devoting up to twenty percent of the office's resources to Plaintiffs' requests. *See* Fields Decl. ¶ 13. Indeed, such a large proportion of the office's resources have been absorbed by this case that Mr. Fields reports there have been negative repercussions for OFAC's ability to handle other FOIA work. *See id.* ¶¶ 15–16.

These efforts have been necessary to enable OFAC to meet the required monthly review rate in this case, 3,000 pages per month, a rate that is an order of magnitude higher than any processing requirement that OFAC has been subject to in litigation. *Id.* ¶ 12. With only a

---

[6] The Court continued to admonish that the agency "cannot simply refuse to act on the ground that the documents originated elsewhere." *McGehee*, 697 F.2d at 1110. Given the extensive work OFAC has done in responding to Plaintiffs' requests, that admonition has no application here.

handful of exceptions when OFAC sought extensions of time with Plaintiffs' consent, OFAC has consistently met the required review rate. *Id.* ¶ 17. To date, OFAC has reviewed over 60,000 pages for responsiveness, and processed over 11,000 pages of responsive records. *Id.*

Plaintiffs suggest that OFAC has not complied with this Court's August 23, 2019 Order because, according to Plaintiffs, that Order "requires that all documents be 'process[ed] . . . within 17 months or so.'" Pls.' Mot. at 3 (quoting Order, ECF No. 16 at 4). But the Court did not order that production must be completed in that timeframe; rather, the Court was predicting how long processing would take in light of the required rate of review. *See* Order, ECF No. 16 at 4. Plaintiffs attempt to transform the Court's predictive approximation into a mandatory deadline, but omit to state that the Court actually declined to grant the very relief they are seeking here. Alongside their proposed processing schedule, Plaintiffs asked the Court to limit to thirty days the time available to consult with other agencies or components regarding their equities in responsive documents. The Court declined to include such a limit. *See* ECF No. 16, *generally*.

Now, when a global pandemic presents unprecedented obstacles to agencies' FOIA work, the proposed rigid time limitation on consultations/coordinations makes even less sense. Mr. Fields notes that, although the OFAC FOIA Office has reminded them of the urgency of completing the consultation requests, other agencies with equities in records in this case have reported that their ability to respond to a consultation or coordination has been negatively impacted by the COVID-19 pandemic, including due to significantly reduced staffing and competing priorities. Fields Decl., ¶ 39; *see supra* 7–8 (discussing the impact of COVID-19 on FBI and State Department FOIA processing capabilities).

15

Yet, notwithstanding these unprecedented challenges, OFAC has made substantial progress on the majority of the consultation/coordination and submitter notice processes that OFAC has initiated in this case.[7]  Defendant has received responses to twenty-six of thirty-seven consultation/coordination requests, and now awaits the response in only one submitter notice process out of thirteen.  Fields Decl. ¶¶ 32–33, 35.  As reflected in the descriptions above, these processes can require significant time to complete.  For consultations/coordinations, beyond following up regarding outstanding requests, the FOIA analyst must seek clarification with respect to any inconsistent redactions submitted by equity holders; apply redactions by all equity holders and OFAC; and then submit the records through quality assurance, and subject matter expert and attorney review.  *See* Fields Decl. ¶¶ 24–25.  Only after the completion of all of these steps can the analyst release the redacted records to Plaintiffs.  *Id.* ¶ 25.  In the context of the submitter notice process, the FOIA analyst must consider any written objections received, potentially in consultation with a supervisor or legal counsel, and then must draft a letter responding to the objections.  *Id.* ¶ 31.

The same resources needed for these tasks are required to meet OFAC's required monthly review rate of 3,000 pages per month.  *See* Fields Decl. ¶ 36.  As explained above, a FOIA analyst is devoted full time to the instant case, and has devoted numerous nights and weekends to reviewing and processing records in this case, including to make progress on consultations/coordinations and submitter notices.  *See id.* ¶ 14.  After OFAC completes the production of records not subject to consultation/coordination or submitter notice in this case—

---

[7] As noted above, OFAC anticipates that ongoing review will identify additional records for which consultation/coordination and submitter notice processes will be required.  *See supra* 5.

16

which OFAC expects to do in the next two months—the analyst will have more time to devote to the consultations/coordination process, and any remaining submitter notice issues. *Id.* ¶ 38.

Especially at this time, when OFAC has been diligently reviewing documents and making monthly productions, and showing significant progress on consultation/coordination and submitter notice processes notwithstanding the challenges posed by an unprecedented pandemic, the Court should not order the drastic relief Plaintiffs seek.

## CONCLUSION

For all these reasons, the Court should permit Defendant to continue its consultation/coordination and submitter notice processes, and deny the Plaintiffs' Motion.

Dated:  March 12, 2021　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　BRIAN M. BOYNTON
　　　　　　　　　　　　　　　　　　　　Acting Assistant Attorney General

　　　　　　　　　　　　　　　　　　　　MARCIA BERMAN
　　　　　　　　　　　　　　　　　　　　Assistant Branch Director
　　　　　　　　　　　　　　　　　　　　Federal Programs Branch


　　　　　　　　　　　　　　　　　　　　 */s/ Julia A. Heiman*
　　　　　　　　　　　　　　　　　　　　JOSHUA M. KOLSKY
　　　　　　　　　　　　　　　　　　　　JULIA A. HEIMAN (D.C. Bar No. 986228)
　　　　　　　　　　　　　　　　　　　　Federal Programs Branch
　　　　　　　　　　　　　　　　　　　　U.S. Department of Justice, Civil Division
　　　　　　　　　　　　　　　　　　　　1100 L Street, N.W.
　　　　　　　　　　　　　　　　　　　　Washington, DC  20005
　　　　　　　　　　　　　　　　　　　　Tel. (202) 616-8480 / Fax (202) 616-8470
　　　　　　　　　　　　　　　　　　　　julia.heiman@usdoj.gov
　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendant*